IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CRIMINAL NO. 21-386 |
| DOMINGO ANTONIO FEBLES | |

**MEMORANDUM**

**SCHMEHL, J.**  */s/JLS*                                                  December 6, 2022

Defendant was indicted by a federal grand jury for one count of possession with intent to distribute 40 grams or more of fentanyl and one count of reentry after deportation. The Uber in which Defendant was a passenger was stopped and the driver consented to a search which produced 1003 tablets of fentanyl in the pocket of the passenger seat directly in front of Defendant. Claiming that the vehicle in which he was traveling was stopped without reasonable suspicion of a traffic violation and that the traffic stop was unlawfully extended in duration and scope, Defendant moves to suppress any and all physical evidence recovered, as well as his fingerprints, his identity information, statements made by him and his immigration file. The Court held an evidentiary hearing on the motion to suppress. For the reasons that follow, the motion is denied.

**I.  FACTS**

In late 2020, DEA Special Agents ("SAs") and Task Force Officers ("TFOs") initiated an investigation into an Allentown drug-trafficking organization ("DTO") run by

1

Brian Cortes, who is charged separately at 21-CR-297. Special Agent Mark O'Donnell was one of the lead investigators. See ECF No. 33, Ex. A, April 29, 2022 testimony of O'Donnell (hereinafter "N.T.") at p. 9. On April 1, 2021, the DEA received wiretap authorization for one of Cortes' phones, and on May 12, 2021, the DEA received additional authorization for a second phone belonging to Cortes: (484) 750-8607. N.T. 10.

Law enforcement learned that Cortes and his co-conspirators were primarily operating out of a barbershop located at 1825 Tilghman Street, Allentown, PA and a garage located at 930 N. 4th Street, Allentown, PA. From confidential sources, investigative, and intercept information, the DEA knew that Cortes' DTO dealt with heroin/fentanyl and narcotics pills. Pole cameras were set up at the barbershop and the garage in early March 2021. During controlled buy operations on January 21, February 10, and April 6, 2021, a DEA confidential source ("CS") coordinated to purchase heroin/fentanyl from Cortes and the DTO. Cortes was observed on the pole camera surveillance leaving the garage just prior to delivering the fentanyl to the CS and returning to the garage thereafter. Prior to the April 6 controlled buy, on April 1, the DEA obtained court-approved Title III wire and electronic interceptions of the cellphone used by Cortes, (610) 401- 8549, for 30 days. On May 12, 2021, the Court authorized an additional 30 days of wire and electronic interceptions on Cortes' phone, and 30 days of wire communications on a co-conspirator's phone, (484) 707-7798, and 30 days of wire and electronic communications on Cortes' second drug phone, (484) 750-8607.

Defendant in this matter was identified as a probable drug supplier to the Cortes DTO during the DEA's surveillance at the garage and wire intercepts of Cortes' second

drug phone, #8607, between May 29, 2021, and the morning of June 3, 2021. In the days prior to Defendant's apprehension, the DEA was also able to identify Defendant as a person who was seen at the garage on April 11, 2021.

On May 29, 2021, the DEA intercepted and transcribed a phone call from (347) 779-4523 (later identified as Defendant's phone number), and Cortes' #8607. N.T. 14. Defendant first chided Cortes for not checking in on him and said he had "pneumonia" and was "dying," and Defendant further explained he was "messing with this shit, preparing the- the thing for nails." Defendant continued, "I didn't find anyone to do it for me, so I started doing it myself and all that dust killed me, it ended my life." Defendant chastised Cortes for not sending someone to check on him since they did not meet up as expected, then Defendant said he would meet him at Cortes' shop. SA O'Donnell understood that Defendant was "talking about preparing drugs." N.T. 20. He explained that drug dealers often talk in code and that when Defendant said he was "sick" from the "dust" he was referring to how when one is "cutting the drugs the dust can go in the air," get into the lungs and make someone sick. N.T. 21. At approximately 2:07 p.m., Febles also told Cortes he would drop by the shop. N.T. 21.

A few hours after this phone call on May 29, at approximately 4:35 p.m., DEA agents observed, via the garage pole camera, a lifted, bright red, Ford F-150 pickup arrive. N.T. 22. Defendant was observed exiting the truck, entering the garage area, and leaving shortly thereafter. N.T. 22. The license plate for the red truck belonged to Alexandra Gomez-Artiles, and "the registration was noted in [the] DEA database as being involved in a prior DEA investigation." N.T. 23.

Based on the distinctive nature of the truck and the driver, agents also concluded that this was the same truck and man that arrived at the garage on April 11, 2021, at approximately 1:22 p.m., as captured on the pole camera surveillance. N.T. 26. On that date, Defendant briefly entered the garage, carried a bag with him, and exited soon thereafter. N.T. 26- 27. This encounter occurred a few days after Cortes was seen exiting the garage just prior to delivering heroin/fentanyl to the CS and returning to the garage after the deal. See N.T. 8. After the May 29, 2021, intercept and surveillance of Cortes and Defendant, on June 2, 2021, agents intercepted another call between the men. At approximately 8:42 p.m., Defendant called Cortes and asked, "Do I see you in the morning?," to which Cortes responded, "After 10:30." N.T. 28-29. Defendant ended the conversation: "Okay then. Goodnight, say no more." *Id.* Based on this conversation, and all the information gathered during the investigation into Cortes' DTO, the DEA decided to set up an operation the next morning to intercept Defendant as part of a "wall-off stop" in order to not disclose the larger investigation. N.T. 29-30.[1] The DEA contacted the PSP Shield Unit to arrange an operation for the morning. N.T. 30.

In the morning of June 3, 2021, the DEA coordinated with the PSP to intercept Defendant prior to his drug supply to Cortes. SA Mark O'Donnell met with PSP Trooper John Stepanski, who would be working with the DEA. N.T. 31. SA O'Donnell informed Trooper Stepanski that the DEA was "doing a wiretap on Mr. Cortes," they believed the defendant would be a "source of supply"; "they intercepted calls with him, and they were

---

[1] A "wall-off stop" is a common investigative technique used in wiretap investigations that is "designed to 'wall-off' information about the ongoing investigation from the instant encounter." *United States v. Ramsey*, 2017 WL 1349185 at *3-4 (E.D. Pa. March 7, 2017) (citing law enforcement testimony and explaining the purposes and use of "wall-off stops" in wiretap investigations).

due to meet this morning and [the DEA] believed [the defendant] was going to be doing a drug transaction with Mr. Cortes." N.T. 31. O'Donnell told Trooper Stepanski this information with hopes that "he could see a traffic violation in order to do a wall off stop," which O'Donnell described as follows:

> Wall off stop would be like we have a federal investigation going on all right. We don't want to reveal our wiretap at the time, so, we'll look for another legal means in order to conduct a lawful search or lawful traffic stop, and attempt to either get consent or probable cause to conduct a search based off the stop itself, separate from our federal investigation … [I]f the feds or DEA does the stop, individuals know wiretaps are involved, there is a lot more to the stop than just the stop itself, and then phone changes, drug locations are moved and everything changes up and can set our investigation back.

N.T. 31-32.

O'Donnell also testified that the stop of Febles was to take place on June 3, 2021, the wire was set to expire on June 10, 2021, and they were planning to "take the investigation down with the wire expiring, we were writing search warrants." N.T. 32. There was also another controlled buy planned prior to the takedown. N.T. 32.

At 11:05 a.m., Defendant was observed exiting 2553 Mountain Lane carrying a bag, but he did not get into the red truck. N.T. 30, 34. He entered a RAV4 as a passenger; the RAV4 then departed and surveillance was maintained until picked up by the PSP. N.T. 34. The RAV4 was later stopped and SA O'Donnell remained near the scene to observe from a distance. N.T. 34. He spoke to one of the troopers during the stop to get an update as to whether there would be consent to search the vehicle or not. N.T. 34. If consent was not provided, SA O'Donnell explained that he intended to "search the vehicle based on probable cause." N.T. 35. He did not intend to let Defendant leave the area without being searched. N.T. 35.

5

Trooper Stepanski testified that he works for the PSP Shield Unit. N.T. 57. Prior to this case, he had participated in about a dozen wall-off stop investigations. N.T. 58. His goal is to develop his own probable cause to stop a vehicle without revealing information they have received up to that point. N.T. 58. They are careful when drafting their reports to not reveal the larger investigation. N.T. 58-59. The Shield Unit will reference that they possessed "prior knowledge" before the vehicle stop, but they do not add specifics. N.T. 59. After speaking with him the night before, on the morning of June 3, 2021, Trooper Stepanski met with SA O'Donnell, who informed him that the DEA was "up on a wire, and they were going to need [the PSP] to conduct a traffic stop on a motor vehicle that was going to have drugs in it." N.T. 61.

Trooper Stepanski followed the RAV4 down Mack Boulevard and observed it failing to come to a complete stop at a stop sign and swerve within its lane. After following the RAV4 for several minutes, at 11:12 a.m., Trooper Stepanski pulled the vehicle over after and approached the passenger-side of the RAV4 to talk to the driver. Trooper Stepanski informed the driver that he was pulled over for not completely stopping at a stop sign, asked for license and registration, and asked the driver to step out of the vehicle. Trooper Stepanski's partner, Trooper Fleisher, can be seen on the dashcam video standing behind the RAV4, near the trooper's vehicle. The driver exited the vehicle at 11:15.

Trooper Stepanski, still at the RAV4, had a brief conversation with Defendant, who was a backseat passenger. Defendant provided a driver's license from Puerto Rico, told the trooper he was headed to 645 Turner Street, and indicated he did not know the driver, who was an Uber driver. At 11:17, Trooper Stepanski talked to the Uber driver

6

back at the trooper's vehicle. At 11:23, Trooper Stepanski asked the driver if he had anything illegal in the vehicle. The driver said, "No," and told the trooper he could search, but shortly thereafter the driver said he did not want the trooper to search. Trooper Stepanski informed the driver he could call for a canine.

Then, at 11:24, Trooper Stepanski approached Defendant at the passenger-side window. Defendant was talking on a cellphone and Trooper Fleisher informed Trooper Stepanski that Defendant was breathing heavily. Defendant was asked to step out of the vehicle at 11:25. Defendant told the troopers he was a barber and that he had nothing illegal in the vehicle. Defendant retrieved his black bag from the vehicle to show the troopers his belongings. He said the bag was the only thing that was his and that he consented to the troopers searching his bag. Trooper Stepanski then returned to his vehicle to consult with another trooper about the situation.

At 11:28, Trooper Stepanski can be heard saying, "the only other option is," and he then turned off the car's audio. According to the testimony, the recording was turned off so that the troopers could discuss whether or not they should contact the DEA and get them involved at this time, which would potentially expose the larger DEA investigation they were trying to keep secret. N.T. 71. The troopers understood that an audio recording of the troopers discussing the DEA case, similar to a police report discussing it, could jeopardize the much larger investigation at hand. *Id.*

At 11:29, Trooper Stepanski reapproached the driver, who had just informed Trooper Stepanski's partner that the driver was now willing to give consent to search the vehicle. The driver signed the consent form. N.T. 72. At 11:32, Defendant provided consent for the troopers to search his black bag and reaffirmed that the black bag was the

7

only possession he had in the RAV4. N.T. 73-74. The troopers begin the search at 11:34. At 11:37, Trooper Stepanski discovered a pill bottle in the pocket behind the front passenger seat, which contained suspected narcotics pills.

Defendant was arrested at 11:38, handcuffed, and placed in the rear of Trooper Stepanski's vehicle. The driver denied that the drugs belonged to him. At 11:46, Trooper Stepanski attempted to read Defendant his Miranda rights, but Defendant argued with the trooper and claimed he did not speak enough English to understand. Defendant denied that the drugs were his. Defendant was transported to the station and presented himself as Mariano Bermudez Maysonet, having a driver's license from Puerto Rico in his possession with his image on it; however, it was later discovered through post-arrest fingerprint analysis that his true name was Antonio Domingo Febles and that he was wanted by law enforcement authorities in other jurisdictions. After Defendant's arrest, DEA agents went to 2553 Mountain Lane and spoke with Defendant's girlfriend, Alexandra Gomez-Artiles. She provided consent for them to search the home. The agents located a food saver vacuum sealer, a 20-ton bottle jack, one roll of clear cellophane, a digital scale, tape, new and unused glassine baggies.

After listening to jail calls between Defendant and Gomez-Artiles, on June 10, 2021, agents returned to 2553 Mountain Lane. The jail calls indicated that Defendant wanted Gomez-Artiles to retrieve an amount of money owed to him as a debt. When agents informed Gomez-Artiles of their knowledge of the call, she turned over $9,000 to them and said she obtained the money from "Legal" and received it on Defendant's behalf. The PSP Laboratory later confirmed the 1,003 pills seized from the RAV4 to be a

mixture and substance containing fentanyl and tramadol, weighing approximately 124.07 grams.

Defendant's cellphones were seized upon his arrest and a Federal search warrant was obtained for their contents. Defendant was in possession of a cellphone with number (347) 779-4523 and the phone's records reflect the two phone calls that were captured on the wiretap on May 29 and June 2, 2021, to Cortes' 8607 number. On June 8, 2021, the DEA conducted an additional controlled buy of fentanyl from Cortes' DTO, and on June 10, 2021, the DEA executed numerous search warrants, including one at the garage. Agents discovered a blender and grinder that contained fentanyl residue. Additionally, over 600 grams of fentanyl was recovered from a vehicle the DTO used.

In support of his motion to exclude evidence of his wrongdoing, Defendant argues that the initial stop of the RAV4 was conducted without reasonable suspicion that a traffic violation had occurred; and (2) that police unlawfully extended the stop beyond the time necessary to attend to its initial purpose without reasonable suspicion for doing so. Defendant also argues that there were Fourth Amendment violations that warrant the suppression of his identity.

## II.  DISCUSSION

"As a general rule, the burden of proof is on the defendant who seeks to suppress evidence. However, once the defendant has established a basis for his motion, i.e., the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable." *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995) (citations omitted). The government's burden carries a preponderance

9

of the evidence standard. *United States v. Fautz*, 812 F. Supp. 2d 570, 609 (D.N.J. 2011) (citing *United States v. Matlock*, 415 U.S. 164, 178 n.14 (1974)).

Defendant argues that the initial stop of the RAV4 was conducted without reasonable suspicion of a traffic violation, that the police unlawfully extended the stop beyond the time necessary for its initial purpose without reasonable suspicion, and that the evidentiary fruits of these Fourth Amendment violations must be suppressed. As will be discussed more fully below, Defendant's arguments all fail, as Trooper Stepanski had probable cause to believe that the RAV4 contained drugs based on the collective knowledge doctrine at the time of the stop. Therefore, no additional reason for the stop and search was necessary, the reasonableness of the traffic stop is irrelevant and Defendant's motion to suppress will be denied.

### A. Probable Cause Existed to Stop and Search the RAV4 in which Defendant Was a Passenger

The Fourth Amendment protects against "unreasonable searches and seizures" and requires that warrants issue based only upon a finding of probable cause. *Florida v. Jimeno*, 500 U.S. 248, 250 (1991). Given the "ready mobility" of vehicles, the automobile exception to the warrant requirement allows law enforcement officers to seize and search a vehicle without a warrant if "probable cause exists to believe it contains contraband." *Burton*, 288 F.3d at 100 (*quoting Pennsylvania v. Labron*, 518 U.S. 938, 940, 116 S.Ct. 2485, 135 L.Ed.2d 1031 (1996)). *See also United States v. Thompson*, 545 Fed. Appx. 167 (3d Cir. 2013).

In the instant matter, O'Donnell possessed significant information that Defendant would be conducting a drug transaction that morning. The DEA had been conducting a large investigation into Cortes' DTO since early 2021. N.T. 7. Controlled buys of

fentanyl were conducted from Cortes on January 21, February 10, and April 6, 2021. N.T. 8. A pole camera was erected at Cortes' garage in Allentown. N.T. 8-9. Cortes was surveilled leaving the garage prior to the drug transaction on April 6 and returning there after it was concluded. On April 11, Defendant was captured on video arriving to the garage in a red truck with a bag, entering the garage, speaking with Cortes, and departing shortly thereafter. N.T. 24.

Further, on May 29, the DEA intercepted a conversation between Cortes and Defendant, which SA O'Donnell described as Defendant discussing "preparing drugs" and meeting Cortes at the garage. N.T. 20-21. A little over two hours later, the DEA camera surveillance captured Defendant arriving at Cortes' garage in the red truck and staying only a brief time. N.T. 22. The DEA investigated the truck's license plate and discovered it had been in "our DEA database as being involved in a prior DEA investigation." N.T. 23. Then on June 2, the DEA intercepted a short call between Cortes and Defendant suggesting the men would meet after 10:30 the next morning. N.T. 28. Thereafter, the next morning, at 11:05 a.m., Defendant was witnessed carrying a bag and exiting the home at 2553 Mountain Lane where the red truck was parked and registered to the female occupant; Defendant entered a RAV4 vehicle that arrived and began travelling into the city when stopped. N.T. 30.

In his supplemental briefing in this matter, Defendant argues that the DEA investigation in question was quite broad, involving three controlled buys, 24-hour surveillance camera monitoring of a garage and barbershop linked to Cortes and monitoring various phones associated with Cortes for 60 days, all of which led to observation of Defendant interacting with Cortes only four times. Specifically, Defendant

11

visited Cortes' garage on April 11, 2021, while carrying a bag, placed a phone call to Cortes' phone on May 29, 2021, and discussed preparing drugs, visited Cortes' garage a second time on May 29, 2021, and placed a second phone call to Cortes and arranged a meeting on June 2, 2021. Defendant claims these four interactions with Cortes would not have been sufficient to support probable cause for a warrant to search Defendant or the RAV4 and were not sufficient to justify the warrantless search that took place.

However, I find that the DEA clearly had sufficient probable cause for the stop of the RAV4, and a sufficient basis existed to find that there was probable cause to search the car. "[P]robable cause is a "fluid concept," turning on "the factual and practical considerations of everyday life," which requires only a "fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Caesar*, 2 F. 4th 160, 171 (3d Cir. 2021) (citation omitted). At the time of the stop, law enforcement had probable cause to believe that the Uber in which Defendant was traveling would contain evidence of illegal drug activity and in fact lead to the seizure of drugs. Police had been following his movements and had witnessed Defendant engaged in what could be reasonably be believed to be drug activity. His conversations with Cortes, as well as his visits to Cortes' garage led the DEA to conclude that he was delivering drugs to Cortes that day via the RAV4 and that said drugs were likely to be found in the vehicle at the time he was stopped.

As I have found that the DEA had sufficient probable cause for the stop and search of the RAV4 in which Defendant was a passenger, the next issue I must examine is whether said probable cause can be imputed to the PSP officers who performed the stop and search of the vehicle through application of the collective knowledge doctrine.

The collective knowledge doctrine is when "the knowledge of one law enforcement officer is imputed to the officer who actually conducted the seizure, search, or arrest." *United States v. Whitfield*, 634 F.3d 741, 745 (3d Cir. 2010). In *Whitfield*, the Court concluded that:

> It would make little sense to decline to apply the collective knowledge doctrine in a fastpaced, dynamic situation such as we have before us, in which the officers worked together as a unified and tight-knit team; indeed, it would be impractical to expect an officer in such a situation to communicate to the other officers every fact that could be pertinent in a subsequent reasonable suspicion analysis. Applying the collective knowledge doctrine here, there is little question that there was reasonable suspicion to seize Whitfield.

*Id*. at 746. Whitfield argued that the officer who grabbed him first did not have reasonable suspicion, but the Court noted that the other officers who were right around the corner did and so their knowledge was imputed to the seizing officer and the seizure was held to be lawful. In the instant matter, the Government argues that SA O'Donnell's knowledge should be imputed to Trooper Stepanski in addition to the actual knowledge that Stepanski already possessed, resulting in probable cause to stop and search the RAV4.

In response, Defendant argues that the collective knowledge doctrine is inapplicable in the instant matter because it is confined to "limited circumstances of rigorous cooperation between officers engaged in a single investigation." ECF No. 33, p. 8. Defendant claims that this matter is "far afield from the close, consistent, and fast-paced collaboration between officers seen in *Whitfield*," as the DEA and PSP were not "operating as a tight-knit, unified team with respect to the investigation of Cortes." *Id*., p. 9.

13

However, a review of the relevant caselaw addressing the collective knowledge doctrine shows that it is not as limited as Defendant would have this Court believe. Rather, extensive authority supports the application of the collective knowledge doctrine in this matter. In *United States v. Kaplan*, 526 Fed. Appx. 208 (3d Cir. 2013), a case decided after *Whitfield*, the Third Circuit applied the doctrine in a very similar scenario. In *Kaplan*, two troopers, Skahill and Regan, were conducting a wiretap investigation into a drug-trafficking organization. *Id*. at 210. They learned a target would be transporting drugs, so they contacted their colleagues to conduct a traffic stop. Trooper Shanahan stopped the vehicle for tailgating and told the defendant he was seizing the vehicle due to a suspended license. *Id*. Meanwhile, Skahill and Regan obtained a search warrant based on their investigative information. *Id*. The defendant challenged the stop, seizure, and search. In deciding the defendant's motion to suppress, the Court did not even address Trooper Shanahan's stated reasons for the stop, but instead found that "Skahill and Regan's knowledge supporting probable cause was imputed to Shanahan … regardless of the reason Shanahan provided for stopping and searching the minivan." *Id*. at 214 (citations omitted). The *Kaplan* Court found the stop and search was lawful based on Skahill and Regan's probable cause.

In *Kaplan,* the Third Circuit cited several cases to support its holding, including *United States v. Belle*, 593 F.2d 487, 497 n. 15 (3d Cir. 1979) ("The collective knowledge of the investigating officers is measured in determining probable cause,) which *Whitfield* also cited. *Kaplan* also relied on *United States v.*

14

*Williams*, 627 F.3d 247, 253 (7th Cir. 2010) ("We have applied the collective knowledge doctrine where . . . DEA agents asked local law enforcement officers to stop a specifically-identified vehicle, and the local officers had no knowledge of the facts underlying the DEA's probable cause"), which cited circuit and out-of-circuit cases to support its holding. *Williams*, at 253 (*citing United States v. Chavez*, 534 F.3d 1338, 1341-42 (10th Cir. 2008) (where officer stopped suspect at DEA's request, the fact that the officer pretended that the stop was for a failure to turn on headlights in order to protect the integrity of the DEA investigation did not preclude the application of the collective knowledge doctrine); *United States v. Ibarra-Sanchez*, 199 F.3d 753 (5th Cir. 1999) (DEA knowledge imputed to stopping officer based on the collective knowledge doctrine); *see also United States v. Norton*, 2016 WL 11473830 at *8 (N.D. Ind. April 28, 2016) ("But the fact that the agents preferred to make a 'walled-off' traffic stop to protect their informant and the long-term drug investigation does not mean that they lacked reasonable suspicion to make the traffic stop based on that drug investigation.") (*citing United States v. Sellers*, 2008 WL 2116974, at *5-6 (N.D. Ind. May 20, 2008) (finding that the DEA agents made a strategic decision to effect a "walled off" stop of defendant's vehicle to protect the integrity of their ongoing investigation, the agents' collective knowledge was imputed to the officer making the stop, and thus, the officer also had reasonable suspicion that the defendant was engage in criminal activity); *United States v. Burton*, 288 F.3d 91, 99 (3d Cir. 2002) (an "arresting officer need not possess an encyclopedic knowledge of the

15

facts supporting probable cause, but can instead rely on an instruction to arrest delivered by other officers possessing probable cause.")

Here, SA O'Donnell possessed reliable information that was based on a months-long wiretap investigation into a local drug-trafficking organization, and it was reasonable for Trooper Stepanski to rely upon that information. Information from mere tipsters, let alone DEA agents who have been investigating the subject, has been found sufficient in circumstances far less compelling than those here. *See e.g. United States v. Thompson,* 545 Fed. Appx. 167, 170 (3d Cir. 2013) (confidential informant's tip that a person would be transporting a firearm supplied probable cause to stop the vehicle where informant was reliable). SA O'Donnell's knowledge can and should be imputed to Trooper Stepanski. Based on the totality of the circumstances, the stop and search of the RAV4 in which Defendant was a passenger was supported by probable cause.

As I have found that SA O'Donnell had probable cause to stop and search the RAV4 and that probable cause can be imputed to Trooper Stepanski, I do not need to address any additional arguments set forth in this matter. However, I do note that even if it could be said SA O'Donnell lacked probable cause (that was imputed to Trooper Stepanski), O'Donnell clearly had a reasonable suspicion that Defendant possessed drugs in the RAV4 from the DEA wiretaps. This reasonable suspicion can also be imputed to Trooper Stepanski. From the time of the initial stop to the time when the drugs were found, which was after consent to search was provided, less than 20 minutes of time elapsed. With the reasonable suspicion of drug activity that existed, if consent was not provided, Trooper Stepanski could

have called for a drug-sniffing dog. *See e.g. United States v. Garner*, 961 F.3d 264, 271 (3d Cir. 2020) (since reasonable suspicion existed, the 25 minutes it took for a drug-sniffing dog to arrive did not make the stop unlawful; and given the officers' actions and circumstances, the total time of 56 minutes for the stop until arrest was not unreasonable). The less-than-20-minutes of time that elapsed here was not an unreasonable stop. From the stop until the seizure, probable cause, and at least reasonable suspicion, existed.

### III. CONCLUSION

For all the reasons set forth above, I find that Defendant's Motion to Suppress should be denied.